## In re FVC.COM SECURITIES LITIGATION

**This Document Relates To: All Actions**

**No. 99–1815 CRB.**

United States District Court, N.D. California.

Feb. 14, 2000.

Alan Schulman, Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Steven J. Toll, Cohen Milstein Hausfeld & Toll PLLC, Seattle, WA, Reed R. Kathrein, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, Lori G. Feldman, Milberg Weiss Bershad Hunes & Lerach, Seattle, WA, for Thomas Williams, Plaintiffs.

William S. Freeman, Barbara E. Tanzillo, Joi C. True, Cooley Godward LLP, Palo Alto, CA, for FVC.COM Inc., Ralph Ungermann, Richard M. Beyer, James O. Mitchell, defendants.

## MEMORANDUM AND ORDER

BREYER, District Judge.

This consolidated securities fraud class action arises from defendant FVC.COM's revision of its unaudited financial statements for the quarter ending December 31, 1998. As a result of the change, FVC. Com reported $7 million less in revenue for the fourth quarter 1998 than it had previously reported and the value of its stock plunged by nearly 60 percent.

Now before the Court is defendants' motion to dismiss the Consolidated Complaint ("Complaint"). After carefully considering the pleadings filed by parties, and having had the benefit of oral argument on Feb-

ruary 11, 2000, the motion to dismiss is GRANTED without leave to amend.

## BACKGROUND

### A. *Factual Allegations*

Defendant FVC.COM ("FVC") is the leading provider of broad band network video applications. Complaint ¶ 12. FVC was founded in 1993 by defendants Ralph Ungermann ("Ungermann") and Allwyn Sequeira ("Sequeira") and in April 1998 it completed an initial public offering ("IPO") of stock. *Id.* ¶¶ 5,7,14.

FVC's IPO prospectus disclosed that its future performance would depend in large part on the sales of its products through original equipment manufacturers ("OEMs"), in particular, through Bay Networks and Nortel. Complaint ¶ 14. The prospectus further advised that the "OEM partners generally have no rights of return and historically carried limited amounts of the Company's products." *Id.* ¶ 15. That is, that sales to OEM partners did not include a material risk of loss stemming from product returns. Id. In its third quarter Form 10–Q, FVC disclosed that its two most significant OEM partners, Bay Networks and Nortel, had combined as the result of Nortel's acquisition of Bay Networks and that the combination would not "have a material adverse effect on [FVC's] future operating results". *Id.* ¶ 20.

In January 1999, FVC issued two press releases one week apart from each other announcing preliminary, unaudited financial results for the just-completed fourth quarter of 1998. On January 21, FVC issued a press release which announced anticipated fourth quarter revenues of $12 million, a 58% increase over the $7.6 million in revenues reported in the fourth quarter a year earlier. The release added that "actual results" for the fourth quarter would be released a week later. Complaint ¶ 26. The only FVC officer who made a statement in the release was the Chief Executive Officer ("CEO") Richard Beyer, who had joined FVC two weeks earlier. *Id.*

On January 28, as promised, FVC released its actual unaudited fourth quarter results and confirmed the revenue numbers announced in the January 21 press release. The release announced the first-ever annual profit in the history of the company, and the first significant quarterly profit. Complaint ¶ 27. The next day FVC's common stock rose $2.625 to $13.625, or 24%, on volume of 1.12 million shares (as compared to the daily average of 221,000). Complaint ¶ 31.

Ten weeks later, on April 6, 1999, FVC issued a press release announcing its first quarter fiscal 1999 financial results, which were significantly below analyst expectations for the quarter. Rather than earning $0.03 per share, FVC posted a loss of $0.20–$0.22 per share. The release, entitled "FVC.COM Reports Preliminary First Quarter Results as the Company Redefines Relationship with Largest OEM," explained the decline as follows:

> The Company attributed the drop in revenues to a combination of factors, including a significant decline in business through its major OEM partner. Bay Networks, now a part of Nortel Networks. Bay Networks has been FVC.COM's largest customer for the last several years. Negotiations during the quarter to restructure the companies' relationship resulted in a significant reduction in joint sales activity. Sales to Bay/Nortel fell to approximately 25 percent in the first quarter, compared with approximately 43 percent as previously reported for the fourth quarter of 1998. In addition, the Company stated that Nortel has indicated its intention to move from stocking inventory to having FVC.COM drop-ship it Nortel's customers.

Complaint ¶ 39. In other words, whereas before Bay Networks had paid for FVC products itself and stocked its own inventory of those products. Nortel would instead require FVC to ship product directly to the end user. Nortel would not assume any obligation to pay for any FVC products until shipped to the end user. In the meantime, Nortel would gradually eliminate its inventory of FVC products and would reserve a right to return those products in its inventory which it could not sell. Since the inventory could be returned to FVC, FVC could no longer credit its sales to Bay/Nortel as revenue until and if each product was actually sold to an end-user. *Id.* ¶¶ 22, 30.

In light of Nortel's change in its business practice, the April 6 release also announced a revision of FVC's unaudited fourth quarter 1998 results previously announced on January 28, 1999:

> In order to reflect this change [the restructuring of the customer relationship with Nortel], CEO Rich Beyer, who joined the Company in January of this year, stated that the Company will now record its sales to Nortel on a sell-through basis and has implemented this change effective December 31, 1998. Therefore, FVC.COM is reducing its previously announced revenues for the quarter ended December 31, 1998 by approximately $7.0 to $7.3 million to defer the revenue on inventory of FVC.COM products held by Nortel on December 31, 1998. Such revenues under the revised policy are now being recognized as and when such products are sold by Nortel. Sales for the fourth quarter 1998 are being revised to approximately $4.7 to $5.2 million; earnings per share will be revised accordingly to a net loss per share of approximately $0.20 and $0.22.

April 6, 1999 Press Release. Instead of the $12.3 in revenues FVC had announced in January, FVC's revenue for the fourth quarter 1998 would be between $4.7 and $5.2 million—a reduction of 57% to 61% from what it had previously reported and a net loss rather than a net profit.

### B. *The Consolidated Class Action*

Within days of FVC's Tuesday, April 6, 1999 announcement several securities fraud class actions were filed against FVC in this District. *See* 99–1815 (April 9, 1999), 99–1827 (April 12, 1999), 99–1832 (April 12, 1999), 99–1861 (April 14, 1999), 99–1877 (April 15, 1999), 99–1915 (April 19, 1999), 99–2003 (April 27, 1999), 99–2115 (May 5, 2000). The Court consolidated the class actions in accordance with the Private Securities Reform Litigation Act ("PSLRA") and appointed lead plaintiffs. The lead plaintiffs filed the Consolidated Complaint on September 27, 1999.

The Complaint names as individual defendants the Chairman of the Board. Ungermann, FVC Chief Financial Officer ("CFO") James O. Mitchell ("Mitchell"). FVC Vice President of Engineering and Chief Technical Officer Sequeira. FVC Vice President Sales Alan J. McMillan, and FVC Vice President of Access Business Units James M. Nielsen. The Complaint does not name as a defendant FVC CEO Beyer.

The gravamen of plaintiffs' Complaint is that the January 1999 press releases announcing the unaudited financial results for the fourth quarter 1998 were false because defendants knew at the time the press releases were issued that FVC's relationship with Nortel was being restructured and therefore that FVC could not, consistent with GAAP, recognize at least $7 million in sales to Nortel as revenue:

> During the final quarter of the fiscal year ended December 31, 1998 ("Fiscal 1998"), representatives of Nortel advised the Company that it would substantially change its relationship with FVC in a

manner that would dramatically reduce FVC's revenues for the quarter, while also eliminating any earnings. Specifically, representatives of Nortel advised FVC during this time period that it would no longer stock inventory shipped by FVC, but instead would only accept orders already earmarked for specific customers on a "drop ship" basis—that is, Nortel would tell FVC which customers to ship, and FVC would ship the product. Nortel representatives also advised FVC during the quarter that Nortel would no longer assume the obligation to pay for any FVC products but would only do so when these products were shipped to the FVC end user. Contrary to their prior agreement, Nortel would return any FVC products held in its inventory and not shipped to end users to FVC without any payment obligation.

Complaint ¶ 22; *see also* ¶ 30 (defendants knew in January 1999 that inventory shipped to Nortel was subject to Nortel's right of return).

## DISCUSSION

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief.... [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Court shall dismiss any complaint that does not meet these requirements. *See* 15 U.S.C. § 78u–4(b)(3)(A)(emphasis added).

■ In order to satisfy the requirement of pleading a strong inference of the defendant's required state of mind, a plaintiff "must plead, in great detail, facts that

constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 974 (9th Cir. 1999). As the Ninth Circuit recently explained:

> although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.... [P]articular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA.

*Id.*

Plaintiffs attempt to meet this standard by alleging that defendants knew in January 1999 that Nortel was changing its relationship with FVC and would only pay for products upon shipment to the end user. To bolster their allegations of fraud, plaintiffs also contend that defendants had the "motive" to engage in fraud as is evidenced by their sales of FVC stock in February 1999, shortly after the announcement of the "false" fourth quarter 1998 results. As is explained below, the Complaint's allegations do not support a strong inference that any defendant acted with recklessness, let alone the deliberate recklessness or conscious misconduct required by the PSLRA.

### A. *The Accounting Fraud*

■ The basis for plaintiffs' allegation of accounting fraud is the contention that "[d]uring the fourth quarter of the fiscal year ended December 31, 1998, representatives of Nortel advised the Company that

it would substantially change its relationship with FVC." Complaint ¶ 22. Plaintiffs' allegation is insufficient to survive a motion to dismiss.

First, plaintiffs fail to plead "in great detail" any facts to support the existence Nortel's fourth quarter 1998 communications with FVC. The Complaint does not identify who at Nortel communicated the information to FVC, and more importantly, to whom at FVC the information was communicated. Nor does the Complaint identify when during the fourth quarter the information was communicated to FVC, or even how the information was communicated. *See Silicon Graphics,* 183 F.3d at 984; *Head v. NetManage, Inc.,* 1998 WL 917794 (N.D.Cal. Dec.30, 1998) *2.

Second, because plaintiffs' Complaint lacks any particular allegations as to the purported fourth quarter communications between FVC and Nortel, the Complaint does not support an inference of any wrongdoing by any defendant, let alone a strong inference of deliberate recklessness. *See Silicon Graphics,* 183 F.3d at 984–85; *NetManage,* 1998 WL 917794 *3. Indeed, the lack of any specifics creates an inference that no such communications occurred between Nortel and FVC during the fourth quarter 1998. In other words, the only inference to be drawn from the Complaint is that plaintiffs have no factual basis for alleging that such communications took place during that time period.

Plaintiffs' opposition to defendants' motion to dismiss confirms that the basis for plaintiffs' complaint—that defendants knew prior to January 1999 that Nortel was no longer going to act as an OEM—is pure speculation. Rather than provide specifics as to the alleged communications, plaintiffs contend that such communications must have occurred prior to the January 1999 press releases because the April 1999 "restatement" of the fourth quarter

1998 unaudited financials could only have been done if the information upon which the restatement was based—Nortel's restructuring of its relationship with FVC—was known to FVC at the close of the fourth quarter 1998. As support for this contention plaintiffs rely upon GAAP, and specifically, Financial Accounting Standards No. 16 ("FAS 16") and Accounting Principles Board Opinion No. 20 ("APB 20"), paragraph 13.

Plaintiffs' speculation as to what "must have" occurred is profoundly flawed. First, APB 20 applies to audited financials. See ABP 20 ¶ 3. Plaintiffs nonetheless contend that APB 20 "may also be appropriate in presenting financial information in other forms or for special purposes." Opposition at 9 (quoting ABP 20 ¶ 3). That may be true, but the Complaint and plaintiffs' opposition fail to identify any facts that suggest that FVC applied ABP 20 to its January 1999 release of unaudited financial information.

Second, even if these rules applied to FVC's unaudited financial statements, plaintiffs' statement that under FAS No. 16 "items of profit or loss may only be restated for a prior period if they correct a misstatement in the prior period's reporting" is wrong. FAS 16 does not address the restatement of a prior period financials, it concerns how to report the effect of a previous period's error in the financial statements of the current period. *See* FAS 16 ¶ 11. This is yet another reason it is inapplicable to the statements at issue here.

Third, the relevant professional literature suggests that FVC's "restatement" of its unaudited financial statements based upon events happening subsequent to the close of the reported period was entirely proper. *See* AU § 560, Subsequent Events, AICPA Professional Standards § 560.01; *see also* Section 560.07 ("Subse-

quent events affecting the realization of assets such as receivables or inventories ... ordinarily will require adjustment of financial statements").

Plaintiffs also appear to contend that the fact that Nortel was FVC's largest customer gives rise to an inference of scienter; FVC officials must have known prior to January 1999 that Nortel would no longer act as an OEM. The Complaint and opposition, however, are devoid of any factual allegations that even suggest that Nortel and FVC must have restructured their relationship in the fourth quarter 1998 rather than the first quarter 1999 as FVC publicly stated. Similarly, the fact that the alleged false statements were significant, that is, that FVC reported a profit when in fact it had a loss, does not support an inference of scienter in the absence of *any* allegations that suggest that Nortel advised FVC in the fourth quarter 1998 of the restructuring.

In sum, the theory upon which plaintiffs' lawsuit is now premised—that FAS 16 and APB 20 demonstrate that FVC must have known about the change in its relationship with Nortel before the close of the fourth quarter—is demonstrably false. As such, the Complaint is devoid of any allegations that even remotely suggest that Nortel advised FVC of its restructuring of its relationship with FVC prior to the dissemination of the January 1999 press releases.

## B. *The Stock Sales*

■ Having determined that plaintiffs' allegations as to the timing of Nortel's communications with FVC concerning its restructuring of its relationship with FVC do not give rise to any inference that defendants engaged in fraud, or even recklessness, the Court must still determine whether plaintiffs' allegations of the defendants' stock sales give rise to a strong inference of at least deliberate recklessness. Under binding Ninth Circuit law, of course, stock sales showing motive and opportunity alone are insufficient to create a strong inference of the requisite intent. *See Silicon Graphics,* 183 F.3d at 974, 979. Nonetheless, for the reasons stated below, the Court concludes that the allegations as to defendants' stock sales are insufficient to satisfy the PSLRA whether considered alone or as part of the totality of the circumstances.

■ "Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter, ... insider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Silicon Graphics,* 183 F.3d at 986 (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989)). The factors a Court should consider include: "(1) the amount and percentage of shares sold by insiders: (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*

### 1. The amount and percentage sold by insiders

According to plaintiffs, the defendants collectively sold 13.3% of all stock and options controlled by them; 535,000 shares for $7,525,850 in proceeds. Thus, the defendants retailed over 86% of their exercisable stock shares. This percentage, in and of itself, is not suspicious and in fact suggests that defendants were not aware at the time of their stock sales that the January 1999 press releases contained false information. See *Silicon Graphics,* 183 F.3d at 987 (no strong inference of fraud where defendants retained 90% of their holdings); *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989) (holding on summary judgment that sales of 8% of total holdings of $84 million were

insufficient to create a triable issue); *see also Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir.1994) (minimal sales of stock negates inference of scienter).

Moreover, all insiders (officers and directors) retained over 90% of their stock holdings. *See Silicon Graphics*, 183 F.3d at 986 (court can consider SEC filings under incorporation by reference doctrine). This percentage is more meaningful than the percentage of stock sold by defendants where, as here, the complaint is devoid of any specific allegations as to any defendant. To hold otherwise would allow a securities fraud plaintiff to "cherry-pick" defendants based solely on the fact of whether, and how much, an insider sold.

The individual percentages of stock sold by each defendant are likewise not sufficiently suspicious to support a strong inference of recklessness, let alone deliberate recklessness. Only one defendant, James Niclson, sold more than 30% of his holdings, Ralph Ungermann, the largest shareholder, sold 200,000 shares; only 7.33% of his holdings. Thus, he retained over 92% of his holdings, a decision which cost him, according to plaintiffs' calculations of the decline in the value of the stock, over $9 million. *See Silicon Graphics*, 183 F.3d at 987 (holding that selling 7.7% of stock does not support a strong inference of deliberate recklessness). Mitchell, the CFO, and Sequeria, the Chief Technology Officer, each retained over 80% of their holdings. These percentages are also insufficient to support an inference of scienter, especially in absence of any other allegations in the Complaint which suggest that these defendants (or anyone at FVC) were aware in January 1999 that the January 1999 press releases contained false information.

McMillian, the Vice President Sales, sold 29% of his shares. While this amount is larger than the other defendants, it is insufficient to support an inference that the other defendants were engaged in fraud, especially in light of the fact that his holdings are a tiny percentage of all insider holdings. *See Silicon Graphics*, 183 F.3d at 987. This percentage is likewise insufficient to support an inference of scienter as to McMillian in light of the Complaint's lack of any factual allegations that suggest that (1) Nortel advised FVC in the fourth quarter 1998 of its change in practice, (2) McMillian was aware of Nortel's change of practice before the press releases were issued, and (3) McMillian saw the press releases before they were issued, knew the figures announced were wrong, and had the ability to control the content of the press releases.

Defendant Nielsen did sell what appears to be a "suspicious" amount of stock: 92% of his holdings. Nielson, however, held far fewer shares than any other defendant. *See Silicon Graphics*, 183 F.3d at 987. Moreover, his position—Vice President of FVC's Business Access Unit—does not in and of itself suggest that he would be aware of the alleged false statements in the January 1999 press releases and, as is the case with the other defendants, the Complaint is wholly lacking in any allegations that suggest Nielson had any knowledge of any alleged false statements. *See Silicon Graphics*, 183 F.3d at 987. In sum, the selling of a high percentage of shares by a Vice President cannot—without more—support an inference of scienter let alone a strong inference.

Finally, the fact that FVC's President and CEO, who became CEO just prior to the January press releases, did not sell any of his stock (and, accordingly, was not named as a defendant) negates any slight inference of scienter. One would expect that if, as plaintiffs allege, the Chief Technology Officer was aware that the January 1999 press releases contained false information the CEO and President—the per-

son who made the allegedly false statements—would also know they were false an act as the other defendants. *See Net-Manage,* 1998 WL 917794 *4. The fact that Beyer joined FVC in January 1999 is an unsatisfactory explanation for his lack of sales of stock. Plaintiffs do not explain how the other defendants kept Beyer in the dark about a significant restructuring of FVC's relationship with its largest customer, especially since if the discussions between FVC and Nortel did not occur in the first quarter 1999 as FVC stated. Beyer—who was FVC's CEO during that entire quarter—would know.

### 2. The timing of the sales and prior practice

 The timing of defendants' sales is likewise insufficiently suspicious. As plaintiffs concede, after the April 1998 IPO defendants were prohibited from selling their stock until October 1998. Plaintiffs' opposition attempts to make much of the fact that none of the defendants, other than Sequeira, sold any stock between that time and shortly after the January press releases. They contend that defendants' delay somehow supports an inference that defendants knew the results announced in January were false. However, the opposite inference is equally, if not more, plausible. That is, that defendants did not sell between October 1998 and February 1999 because they honestly believed that FVC was going to post an annual profit for the first time and they wanted to wait until that announcement to sell their stock.

At oral argument plaintiffs stated that the fact that defendants did not sell any stock during the fourth quarter 1998 does not support an inference one way or another. Instead, plaintiffs emphasize that defendants collectively sold 13.3% of their stock during the three-week period following the January press releases. The Complaint lacks any factual allegations, however, that suggest that such timing is suspicious. One would expect shareholders of a company which only recently went public to sell significant sums of stock shortly after the company announced its most profitable quarter in its history. Indeed, if, as plaintiffs contend, defendants knew in January that the fourth quarter financials were false, one would expect that defendants would have continued to sell their stock into March as it became apparent that they were going to have to announce that FVC had actually posted a loss for the fourth quarter. Yet, the Complaint does not allege that any of the defendants made any significant sales in March or early April.

In sum, the defendants' stock sales when considered in connection with the allegations of the Complaint as a whole do not give rise to a strong inference of recklessness, deliberate recklessness, or conscious misconduct. Under *Silicon Graphics* that is the end of the Court's inquiry. Even if stock sales alone, however, could give rise to a strong inference of scienter the stock sales alleged here do not come close to doing so.

### C. Control Person Allegations

 Plaintiffs also contend that defendants are liable as "control persons" under section 20(a) of the Exchange Act. To establish "control person" liability, plaintiffs must show that a primary violation of 10b–5 was committed and that each defendant "directly or indirectly" controlled the violator. *See Paracor Finance, Inc. v. General Electric Capital,* 96 F.3d 1151, 1161 (9th Cir.1996). As is stated above, plaintiffs have failed to plead a violation of 10b–5. For this reason alone plaintiffs' section 20a claim fails.

### D. Leave to Amend

The Complaint will be dismissed without leave to amend. Plaintiffs had more than

four months to draft the Complaint after the initial lawsuit was filed. The Complaint was filed after the *Silicon Graphics* decision so plaintiffs had ample notice of the appropriate standards. Moreover, lead plaintiffs are represented by experienced counsel who have litigated dozens of cases under the PSLRA. Finally, and most importantly, there is nothing in plaintiffs' opposition, or plaintiffs' presentation at oral argument, both of which went well beyond the allegations of the Complaint, that suggests that plaintiffs will be able to correct the glaring deficiencies in their Complaint if they are given leave to amend, especially in light of the fact that they are not permitted to engage in any discovery. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (although leave to amend shall be given freely when justice so requires, futile amendments should not be permitted).

## CONCLUSION

For the foregoing reasons defendants' motion to dismiss is GRANTED without leave to amend.

**IT IS SO ORDERED.**