David S. LIPTON, on his own behalf and on behalf of those similarly situated; Richard Baker, on his own behalf and on behalf of those similarly situated; Ray Fralovk, on his own behalf and on behalf of those similarly situated; Anne Shapiro, on her own behalf and on behalf of those similarly situated; Judy May, on her own behalf and on behalf of those similarly situated; Donald R. Gellert, on his own behalf and on behalf of those similarly situated; Peter Green, on his own behalf and on behalf of those similarly situated; Jerry Bassin, on his own behalf and on behalf of all others similarly situated; C Mark Williams; Paul A. Waskom; Walid Mseitif; and Gregg S. Tenser, Plaintiffs–Appellants–Cross–Appellees,

v.

PATHOGENESIS CORP.; Wilbur H. Gantz; and Alan R. Meyers, Defendants–Appellees–Cross–Appellants.

Nos. 00–35268, 00–35313, CV–99–00419–TSZ, CV–99–00439–TSZ, CV–99–00452–RSL, CV–99–00453–JCC, CV–99–00455–WLD, CV–99–00469–BJR, CV–99–00503–RSL, CV–99–00506–BJR.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 19, 2001.

Filed March 20, 2002.

Matthew J. Ide, Steven J. Toll, and Mark S. Willis (New York), Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Seattle, WA; Robert M. Kornreich and Patricia I. Avery, Wolf Popper, LLP, New York, NY, for plaintiffs-appellants-cross-appellees.

Stellman Keehnel, Gray Cary Ware & Freidenrich, LLP, Seattle, WA; Tim J. Filer and Christopher G. Emch, Foster Pepper & Shefelman, PLLC, Seattle, WA, for defendants-appellees-cross-appellants.

Before KLEINFELD and GOULD, Circuit Judges, and ROLL, District Judge.*

---

* The Honorable John M. Roll, United States District Judge for the District of Arizona, sitting by designation.

1. In determining whether plaintiffs' complaint states a claim upon which relief could

## OPINION

GOULD, Circuit Judge.

Plaintiffs brought this securities fraud class action under §§ 10(b), 20(a) and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), 78t–1(a) and Rule 10b–5, 17 C.F.R. § 240.10b–5, on behalf of all purchasers of PathoGenesis Corporation common stock on the open market between January 15, 1999 and March 22, 1999. Plaintiffs appeal the district court's Rule 12(b)(6) dismissal of their consolidated complaint, without leave to amend, for failure to meet the pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u–4 and 78u–5. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

### A. Facts [1]

■ PathoGenesis Corporation ("PathoGenesis" or "the Company"), founded in 1991, is a pharmaceutical company that develops and markets medicines to treat chronic infectious diseases. PathoGenesis developed TOBI, (tobramycin solution for inhalation), the first inhaled antibiotic designed to treat lung infections for people with cystic fibrosis. Tobramycin, the key element in TOBI, is an antibiotic that had previously been administered through intravenous injection. The introduction of TOBI was an advance in the treatment of cystic fibrosis patients. As an inhaled medicine, TOBI delivers tobramycin in greater concentrations than is possible through intravenous treatment.

---

be granted, we assume the facts alleged in the complaint to be true. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 2002 WL 187407, *1 (9th Cir.2002).

In December 1997, PathoGenesis received U.S. Food and Drug Administration approval to sell TOBI and in January 1998, the Company began selling TOBI to wholesale distributors of pharmaceutical products and mail order pharmacies (collectively, the "wholesalers"). Nearly one year later, on December 11, 1998, PathoGenesis told its wholesalers by letter that the Company was increasing the price of TOBI by at least seven percent, effective that day. The letter further told the wholesalers that they could purchase TOBI at the lower, pre-increase price during a two week "buy-in" period beginning December 11, 1998 (the "buy-in" program). In response to the "buy-in" program, each of the wholesalers purchased large amounts of TOBI, which contributed, in part, to strong fourth quarter ("4Q98") sales. At the end of 1998, PathoGenesis had generated $60.7 million in sales;[2] and its 4Q98 sales totaled $17.8 million, a 20% increase over total sales from the preceding quarter.[3] Because of PathoGenesis' strong fourth quarter earnings, investors had high expectations that sales of TOBI would continue to grow during the first quarter of 1999. Near the end of the first quarter of 1999, however, PathoGenesis announced that sales of TOBI would not meet these heightened expectations and would only be about $10 million. Stock values dropped and plaintiffs alleged securities fraud.

The theory of plaintiffs' complaint is that PathoGenesis had access to information in December 1998 and the beginning of 1999 that showed patient demand for TOBI had plateaued. According to the plaintiffs, the buy-in program was devised both to conceal flat patient demand for TOBI and artificially to inflate 4Q98 sales. Plaintiffs further contend PathoGeneis needed to demonstrate strong sales in order to negotiate favorable financing with lenders, and to expand distribution with foreign distributors.

■ In their complaint, plaintiffs allege that between January 15 and March 22, 1999 (the "class period") PathoGenesis made at least three false and misleading statements designed to create the impression that PathoGenesis' impressive fourth quarter results were the result of increasing patient demand for TOBI. On January 15, 1999, the day the class period begins, PathoGenesis' Chairman and CEO, Wilbur H. Gantz, was interviewed on a syndicated television program. He said that the Company had a "very good fourth quarter" and that PathoGenesis was "seeing a continuing ramp [up of business] here in the United States."[4] Ten days later, Patho-

---

2. Sales of TOBI accounted for over 98% of PathoGenesis' annual sales.

3. TOBI sales in the introductory first quarter of 1998 ("1Q98") were 14.5 million; second quarter sales ("2Q98") were 13.6 million; and third quarter ("3Q98") sales were 14.8 million.

4. A relevant portion of the January 15, 1999 television interview went as follows:

MITZMAN (Host of Show): TOBI had [sic] been out on the market a full year now.
GANTZ: That's right.
MITZMAN: What's been the response?
GANTZ: We've had a wonderful product introduction. The drug is used widely. We haven't yet, not yet announced our results for the year, but we had sold $43 million in the first nine months, and we had a very good fourth quarter.
MITZMAN: Excellent. So that's a[sic] versus $324,000 in revenue for the first nine months of '97.
GANTZ: Not a bad growth.
MITZMAN: You took in $43 million, even Amazon.com can't compete with that growth rate, about $15 million in revenues in just the third quarter alone. You do see that sales will continue to ramp at, near this rate?
GANTZ: Well we're seeing a continuing ramp here in the United States and we're just about to get approval in Canada. And

Genesis announced in a press release its year-end 1998 and 4Q98 results and made what plaintiffs contend is the second misleading statement during the class period.[5] In the press release Gantz said: "Our strong showing is due to excellent acceptance of TOBI by the cystic fibrosis community." The next day, the price of PathoGenesis common stock rose by about 11.8 %, or $5.19, to close at $50.25 per share.

As additional evidence of motive to commit fraud, plaintiffs point to two stock sales made by Gantz during the class period. On February 1, 1999, one week after PathoGenesis announced its 4Q98 and year-end results, Gantz filed a document with the U.S. Securities and Exchange Commission declaring his intention to sell 50,000 shares of PathoGenesis common stock. Gantz began selling his PathoGenesis stock that day, selling 5,000 shares of PathoGenesis common stock at $51 per share. He sold another 5,000 shares of PathoGenesis at $44 per share on February 10, 1999. Before these two transactions, Gantz had not sold any of his holdings of PathoGenesis common stock.

Meanwhile, on February 3, 1999, Alan R. Meyer, PathoGenesis' Chief Financial Officer, made the third allegedly false and misleading statement during the class period. Meyer told attendees at an investor conference that the company was "looking at very strong sales growth and earnings growth for the future." He went on to say, "We think we are poised very well for future penetration of the cystic fibrosis market."[6]

Meyer's optimistic forecast was not met. On March 22, 1999, PathoGenesis issued a mid-quarter press release stating that "some first quarter 1999 sales were accelerated into the fourth quarter of 1998 as patients and wholesalers increased their normal orders." PathoGenesis announced that 1Q99 results would not be as strong as previously predicted and would be approximately $10 million. The next day, on March 23, 1999, PathoGenesis common stock dropped like a rock and plummeted 66%, from $34 a share to $12 a share.

### B. Procedural History

On March 24, one day after the price drop, plaintiff David S. Lipton filed a lawsuit in U.S. District Court for the Western District of Washington against PathoGenesis, Gantz and Meyer. Lipton alleged violations of Sections 10(b)[7] and 20(a)[8] of

we expect approval sometime in the first quarter in Canada. And the United Kingdom, as a first European market, should give us approval in the third quarter of this year.

5. In their complaint, plaintiffs alleged that PathoGenesis also conducted a conference call with investment analysts on January 25, 1999 where the defendants allegedly made false statements. Plaintiffs do not discuss this conference call in their opening brief and we consider this allegation waived. See Kim v. Kang, 154 F.3d 996, 1000 (9th Cir.1998) (Ninth Circuit will not ordinarily consider matters that are not specifically and distinctly argued in appellant's opening brief).

6. Meyer's speech to investors was accompanied by a cautionary statement: "This presentation contains 'forward-looking statements' that are subject to risks and uncertainties and may cause PathoGenesis' actual results to be materially different from historical results or any results expressed or implied by such forward-looking statements. For more information on such risks and uncertainties, see Exhibit 99 of the company's Form 10–k."

7. Section 10, in relevant part, states:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange

—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security regis-

the Securities Exchange Act of 1934 and Rule 10b–5.[9] Shortly thereafter, seven more actions were filed in the same court. The eight cases were consolidated. Nearly six months later, on September 10, 1999, a consolidated amended class action complaint was filed against PathoGenesis, Gantz and Meyer. This complaint added a claim under Section 20A of the 1934 Act.[10]

In November 1999, defendants filed a motion to dismiss plaintiffs' complaint. Defendants submitted documents, including, *inter alia,* graphs that tracked the number of prescriptions for TOBI and investor analyst reports on PathoGenesis. The prescription data graphs submitted with defendants' motion to dismiss were generated by ProMetrics Consulting, Inc. PathoGenesis relied on ProMetrics to pro-

vide weekly and monthly information on the number of patient prescriptions being filled for TOBI. ProMetrics, in turn, received this data from an information vendor, IMS Health ("IMS"). The IMS data was available to the investment analysts who followed PathoGenesis and was available to anyone who subscribed directly with IMS or through an intermediary, such as ProMetrics. Reports from investment analysts indicated that in December 1998 and during the class period, patient demand for TOBI was on the rise.[11]

After the filing of defendants' motion to dismiss, the plaintiffs moved to strike the ProMetrics graphs and the investment analyst reports. On February 14, 2000 the district court granted plaintiffs' motion to strike the prescription demand data, find-

---

tered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

8. Section 20(a) states:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

9. Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

10. Section 20A, in relevant part, states:

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable ... to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased ... or sold ... securities of the same class.

11. A December 4, 1998 analyst report stated: "By our analysis of weekly prescription data from IMS America, TOBI prescriptions for the first seven weeks of the fourth quarter have exceeded those of the first seven weeks of the third quarter by 18%." A February 17, 1999 analyst report stated: "Our analysis of weekly prescription data from IMS America suggests that sales of TOBI to date in 1999 have tracked well ahead of fourth quarter 1998 results ..."

ing the authenticity of these reports in dispute. But the district court ruled that it would consider the investment analyst reports for the purpose of determining whether and when information was disclosed to the market.

On February 17, 2000, the district judge, in an oral ruling, dismissed the complaint with prejudice, holding that: (1) plaintiffs had not pleaded detailed and particular facts giving rise to a strong inference of scienter as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and (2) two of the three challenged statements were forward-looking and protected by the PSLRA's safe harbor provision. *See* 15 U.S.C. § 78u–5(c). The plaintiffs appealed the dismissal and the defendants cross-appealed the district court's order that excluded the graphs of patient prescription data.

## II. PLEADING SCIENTER UNDER SILICON GRAPHICS

The dispositive issue for us is whether the district court erred in holding that the

plaintiffs did not adequately plead scienter. Our inquiry here is governed by the PSLRA. There, Congress provided that in any private securities fraud action for money damages, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[12]

■ Although there is disagreement in the federal courts of appeals about the meaning of the "required state of mind,"[13] we have previously held that "the PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of *deliberate or conscious recklessness.*" *In re Silicon Graphics Inc. Sec.*

**12.** Before the passage of the PSLRA, the "pleading requirements in private securities fraud litigation were governed by Fed. R.Civ.P. 9(b), which required only that 'falsity' be pled with particularity; scienter could be averred generally." *Ronconi v. Larkin,* 253 F.3d 423, 429 n. 6 (9th Cir.2001). The PSLRA changed the pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter. *Id.* at 429.

**13.** *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 197 (1st Cir.1999) (pleading motive and opportunity is sufficient if it raises a strong inference of scienter); *Novak v. Kasaks,* 216 F.3d 300, 309–10 (2d Cir.2000) (pleading "motive and opportunity or strong circumstantial evidence of recklessness or conscious misbehavior" is sufficient); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534–35 (3d Cir.1999) (pleading motive and an opportunity to commit fraud or circumstantial evidence of either reckless or conscious behavior is

sufficient); *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 412 (5th Cir.2001) ("it would seem to be a rare set of circumstances indeed where [allegations of motive and opportunity] alone are ... sufficiently persuasive to give rise to a scienter inference of the necessary strength"); *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 550 (6th Cir.1999) ("plaintiff may survive a motion to dismiss by pleading facts that give rise to a 'strong inference' of recklessness"); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 660 (8th Cir.2001) (pleading "unusual or heightened motive" will often be sufficient); *City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245, 1263 (10th Cir.2001) (pleading "facts presenting motive and opportunity may be" sufficient, "whereas pleading conclusory labels of motive and opportunity will not suffice"); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282–83 (11th Cir.1999) (allegations of motive and opportunity to commit fraud alone are insufficient to plead scienter, unless defendant acted recklessly or knowingly).

*Litig.*, 183 F.3d 970, 979 (9th Cir.1999) (emphasis added). Our decision in *Silicon Graphics* also holds that plaintiffs who plead the required state of mind in general terms of mere "motive and opportunity" or "recklessness" fail to meet the PSLRA's heightened pleading requirements. *Id.* Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a strong inference of scienter, a Rule 12(b)(6) dismissal is proper. *See Ronconi*, 253 F.3d at 429.

■ Plaintiffs asserted that fraudulent misrepresentations and omissions occurred in (1) Gantz's January 15th statement that sales were continuing to ramp up; (2) Gantz's January 25th statement in a press release that PathoGenesis' "strong showing is due to excellent acceptance of TOBI by the cystic fibrosis community;" and (3) Meyer's February 3rd statement to investors at a conference that PathoGenesis was "looking at very strong sales growth and earnings growth for the future." Plaintiffs' complaint challenged the accuracy and completeness of these statements and alleged that misrepresentations were made to create the perception of strong patient demand for TOBI.[14]

■ We focus on the element of scienter,[15] the "required state of mind" that the PSLRA requires be pleaded with particularity. Plaintiffs attempted in their complaint to show scienter from: (1) de-

fendants' alleged receipt of reports indicating flat patient demand; (2) Gantz's February 1999 sale of PathoGenesis stock; and (3) defendants' alleged motive to impress PathoGenesis lenders with reports of strong financial performance and to expand internationally. The district court found the allegations inadequate under the PSLRA and our decision in *Silicon Graphics.*

We review de novo the district court's dismissal of plaintiffs' complaint for failure to state a claim under Rule 12(b)(6). *Silicon Graphics*, 183 F.3d at 983. We agree with the district court that, taken as a whole, plaintiffs' allegations do not give rise to a strong inference that defendants acted with deliberate or conscious recklessness.

## A. *Internal Reports*

■ Plaintiffs allege that PathoGenesis knew that patient demand was flat because the company had access to (1) internal reports on sales data and (2) IMS patient demand data. According to plaintiffs, both types of data informed the defendants that 1Q99 sales would be lower than investors were led to believe.

We first address plaintiffs' allegation that PathoGenesis "could regularly track its sales data" to show that the defendants knew or should have known that patient demand for TOBI was flat during the class

---

**14.** We recently held that to survive a motion to dismiss under the PSLRA, "the plaintiffs' complaint must specify the reason or reasons why the statements made . . . were misleading or untrue, not simply why the statements were incomplete." *Brody*, 280 F.3d 997, 2002 WL 187407 at *8. Plaintiffs cannot merely allege that defendants' statements were incomplete because the defendants did not explicitly disclose the existence and details of the buy-in program. Instead, to survive Rule 12(b)(6) dismissal, the plaintiffs must allege with specificity that the defen-

dants made false or misleading statements with deliberate or conscious recklessness.

**15.** Scienter is an essential element of a § 10(b) or Rule 10b–5 claim. *See McCormick v. Fund American Cos.*, 26 F.3d 869, 875 (9th Cir.1994). And to prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b 5. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.1993). Absent pleading scienter with particularity, there can be no liability in this case.

period. In *Silicon Graphics*, we explained that a "proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Id.* at 985. Here, plaintiffs merely assert in conclusory terms that the defendants had access to internal data demonstrating a decline in sales of TOBI. Plaintiffs do not identify any internal reports of "sales data," much less plead, in any detail, the contents of any such report or the purported data. *See id.* at 985. Without this information, as was the case in *Silicon Graphics*, "we cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge" of flat patient demand "that would cause their optimistic representations to the contrary to be consciously misleading." *Id.*

We next address the claim that defendants had access to IMS data that allegedly informed the defendants that patient demand for TOBI was flat. The plaintiffs' complaint states: "Based on the IMS data available, defendants knew, or were reckless in not knowing, and failed to disclose that patient demand for TOBI was flat (and not increasing) during the Class Period." But again, this allegation does not give rise to a strong inference that defendants acted with deliberate or conscious recklessness. Although plaintiffs refer to the existence of the IMS data and make a general assertion about what they think the data shows, plaintiffs do not allege with particularity any specific information showing that prescription data informed defendants that patient demand for TOBI was flat. Plaintiffs do not mention a specific IMS document relied on by defen-

dants such as a particular IMS report, graph or chart. Nor do they detail with particularity the content of such data. Rather, plaintiffs merely allege that PathoGenesis tracked patient demand using data provided by IMS and that this data supposedly indicated that patient demand was flat. As we held in *Silicon Graphics*, negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA.[16] *See id* at 985. We hold that plaintiffs' allegations of negative internal reports and IMS data are insufficient to demonstrate deliberate or conscious recklessness.

### B. *Stock Transactions*

█ Plaintiffs also allege in their complaint that securities fraud may be inferred from Gantz's sale of 10,000 shares of PathoGenesis shortly after the company announced its 4Q98 earnings. They contend that Gantz's sale of PathoGenesis stock gives rise to a strong inference that defendants knew that their public forecasts during the class period were knowingly false when made because Gantz: (1) had not previously sold any shares of PathoGenesis common stock; (2) intended to sell more shares of PathoGenesis common stock than the 10,000 actually sold; and (3) sold his shares after he and Meyer allegedly made inaccurate and misleading forecasts.

We have previously held that a strong inference of fraudulent intent may occur when an insider "owning much of a company's stock make[s] rosy characterizations of company performance to the market

---

**16.** Because we hold that the plaintiffs general characterization of the IMS reports on patient demand did not meet the heightened pleading requirements of *Silicon Graphics*, we do not address whether the district court erred in excluding consideration of the IMS reports. Similarly, we have no reason to address plaintiffs' contention that consideration of the analysts' reports was in error.

while simultaneously" selling large percentages of his holdings. *Ronconi,* 253 F.3d at 434. But that did not occur here. The insider sales are not substantial in the aggregate compared to the market, only Gantz and not other insiders sold during the class period, and the sales by Gantz were only a small part of his total holdings. Gantz's sales of 10,000 shares of stock, a tiny percentage of his holdings, does not support any inference of impropriety or fraud.

As we explained in *Silicon Graphics:*

[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed information ... Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.

183 F.3d at 986 (citations and internal quotations omitted). In this case, Gantz's sale of 10,000 shares constituted only 1.4% of his total PathoGenesis holdings. The sale of such a small percentage of total holdings does not give rise to the strong inference of scienter required by the PSLRA. *See Ronconi,* 253 F.3d at 435 (suggesting that sales of 10% and 17% of an individual's holdings were not suspicious); *Silicon Graphics,* 183 F.3d at 986–87 (transactions of four of six corporate officers who each sold less than 8% of their total holdings were not suspicious).[17] Gantz's sales as alleged can equally or more likely support the inference that he was engaging in modest diversification.

We also conclude that the timing of Gantz's stock transactions was not suspicious. Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures. That Gantz would sell an extremely small portion of his total holdings following the positive announcement of PathoGenesis' year-end and fourth quarter earnings does not support an inference that Gantz knew or should have known that the optimistic reports of TOBI's projected growth were false. *See In re FVC.COM Sec. Litig.,* 136 F.Supp.2d 1031, 1040 (N.D.Cal.2000) (officers' sale of shares following press release announcement of anticipated increase in quarterly revenues is not suspicious and does not support inference of scienter).

That no inference of fraudulent intent arises from the timing of Gantz's modestly proportioned sales is further reinforced by the fact that Gantz was the only insider to sell PathoGenesis common stock during the class period. All other directors and officers fully retained their holdings, and Gantz retained 98.6%, while the price of PathoGenesis common stock fell from $51 to $34 during the class period. As we held in *Ronconi,* "[o]ne insider's well timed sales do not support the 'strong inference' required by the [PSLRA] where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." 253 F.3d at 436. *See also In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1424–25 (9th Cir.1994) (finding no scienter because defendants "held onto most of their [company's] stock and incurred the same large losses" as plaintiffs). Gantz had never before sold PathoGenesis stock and thus we cannot compare the two challenged stock transactions to prior trad-

---

**17.** Even if Gantz had sold 50,000 shares, as was his initial intent, such a transaction would only constitute 7% of his total holdings with a planned retention of 93%. That proportion would not bolster a fraud claim.

ing history. But we do not hesitate to conclude, under the circumstances alleged, that the sale of such a small percentage of Gantz's holdings during a period when no other insider was selling stock does not here give rise to a strong inference of deliberate or conscious recklessness.

### C. Assertions of Improper Motive and Opportunity

 Plaintiffs allege that PathoGenesis concealed knowledge of flat patient demand to enhance opportunity (1) to secure a line of credit from its lender and (2) to gain regulatory approval abroad. These generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of *Silicon Graphics*.

If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995). PathoGenesis' alleged desires to obtain favorable financing and to expand abroad are in themselves ordinary and appropriate corporate objectives. Such routine business objectives, without more, cannot normally be alleged to be motivations for fraud. To hold otherwise would be to support a finding of fraudulent intent for all companies that plan to lower costs and expand sales.

### D. Plaintiffs' Allegations Considered as a Whole

 We now consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.

Taken as a whole, plaintiffs do not meet the stringent pleading standard of *Silicon Graphics*. None of plaintiffs' allegations provide the critical details necessary to support an inference that defendants knew that wholesaler purchases of TOBI in 4Q98 would lead to overstocking and result in fewer 1Q99 sales. Nor do any of plaintiffs' allegations allege particularized facts that could lead us to infer that defendants knew wholesalers' purchases exceeded patient demand. *See Ronconi*, 253 F.3d at 437 ("the pleading has to state particularized facts that, taken as a whole, raise a strong inference" of scienter). We hold that plaintiffs' allegations, taken together, do not constitute a pleading giving rise to a strong inference of deliberate or conscious recklessness.

## III. DISMISSAL WITH PREJUDICE

 The plaintiffs argue on appeal that the district court's dismissal of the complaint with prejudice was improper. We review the district court's denial of leave to amend for abuse of discretion. *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir.2001).

 More than six months elapsed between the filing of the original lawsuit and the filing of the consolidated amended complaint. And after defendants filed their motion to dismiss in November 1999, plaintiffs had an additional three months before the district court's hearing when they could have amended their pleadings to correct the deficiencies in their complaint. Plaintiffs had ample opportunity to amend their complaint before the dismissal.

 However, as leave to amend is to be freely granted when justice so requires, *see* Fed.R.Civ.P. 15(a), we do not base our opinion on the failure to amend

before the adverse ruling. It is not unreasonable that plaintiffs may seek amendment after an adverse ruling, and in the normal course district courts should freely grant leave to amend when a viable case may be presented. *See* Fed R. Civ. P. 15(a); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (leave to amend should be granted unless the district court "determines that the pleading could not possibly be cured by the allegation of other facts"). Here, however, as the basic facts are alleged and have been analyzed by the district court and us, we conclude that plaintiffs cannot cure the flaws in their pleading. In the circumstances of a new product and developing market, we do not think it can be fairly alleged that the company knew that patient demand in the future year would not keep pace with prior sales growth. Because any amendment would be futile, there was no need to prolong the litigation by permitting further amendment. *See Klamath–Lake Pharmaceutical Ass'n v. Klamath Med. Serv. Bureau,* 701 F.2d 1276, 1293 (9th Cir.1983) (futile amendments should not be permitted); *Silicon Graphics,* 183 F.3d at 991 (denying leave to amend because defects in pleadings could not be cured by amendment). We affirm the denial of leave to amend.

## IV. CONCLUSION

The allegations in plaintiffs' complaint, taken as a whole, fail to raise a strong enough inference of scienter to meet the

heightened pleading requirements of the PSLRA.[18]

**AFFIRMED.**

---

**18.** Plaintiffs claim that the district court also erred by holding that Gantz's statement that PathoGenesis was "seeing a continuing ramp" up in sales and Meyer's statement "that the company is looking at strong sales growth" were protected by the PSLRA's safe harbor. *See* 15 U.S.C. § 78u–5(c)(1). We need not address these issues. Because plain-

tiffs' allegations do not satisfy the general standard of deliberate or conscious recklessness, as explained in *Silicon Graphics,* we need not assess whether any of the challenged statements are forward-looking and thus require the stricter standard of actual knowledge of falsity as the required state of mind.