ROBERT M. PARKER, Circuit Judge,
concurring:
In general terms, Plaintiffs allege that Defendants fraudulently misrepresented the effectiveness of Baker Hughes’s internal accounting controls, and that Plaintiffs, having relied on these representations, were damaged when the company later revealed the true state of its financial affairs. They contend that as Baker Hughes merged or acquired other entities the accuracy of company-wide accounting practices deteriorated. Methods for reporting asset values and earnings, for example, differed from one business unit to the next. Plaintiffs allege that the lack of a single, coherent accounting practice caused Baker Hughes to issue numbers that did not fairly represent the company’s disparate divisions. The consequences of Baker Hughes’s growth, from an accounting standpoint, was understood by Defendants, Plaintiffs argue. That they continued to represent the company’s financials as accurate anyway evidences severe recklessness.
Allegations like the foregoing, if properly detailed, are sufficient to state a cause of action for. securities fraud. A company’s public filings are the medium through which stockholders monitor the performance of directors' and management. When that conduit is wrongfully obscured owners lose the only reliable means they have for protecting hard-earned capital. History reminds us of the consequences when the financial statements of publicly-held companies do not accord with reality. Indeed, it was to protect against them that our nation’s securities laws were enacted.
At the same time, we must pay heed to a different set • of consequences — those brought about by the overzealous prosecution of specious securities fraud actions. Congress, in passing the Private Securities Litigation Reform Act of 1995, took pains to deter such strike suits. Its findings and legislative history suggest that the cost of protecting against fraud was unduly impairing the efficient operation of lawful businesses. Today, when applying- the PSLRA, courts must keep this policy consideration foremost in mind. But we must also recognize that Congress left unaffected shareholders’ right to sue for recompense when they are made the victims of self-dealing and deceit. The PSLRA is a mechanism for winnowing out suits that lack a requisite level of specificity. It was not meant to let business and management *436 run amuck to the detriment of shareholders.
With respect to the case at hand, I view it as being very close. Ultimately, however, I like the majority conclude that Plaintiffs’ complaint does not pass muster under the stringent standards of the PSLRA.
I.
The PSLRA did not change the substantive state-of-mind requirement for securities fraud, as we recognized in Nathenson v. Zonagen, Inc., 267 F.3d 400, 408 (5th Cir.2001). As before, severe recklessness will satisfy the scienter element. See id. What did change- was the pleading standard. Now, when alleging scienter, a plaintiff must state particular facts giving rise to a strong inference of severe recklessness. See 15 U.S.C. § 78u-4(b)(2). Only one circuit has reached a different conclusion. The Ninth Circuit has concluded that under the PSLRA a plaintiff must prove that the defendant was at least deliberately reckless. See In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 975-77 (9th Cir.1999). Thus, by extension, to survive a motion to dismiss, a plaintiff in that circuit must state facts that give rise to a strong inference of knowing misconduct.. See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035-36 (9th Cir.2002). In Nathenson, we expressly declined to follow the Ninth Circuit’s articulation of scienter. 267 F.3d at 409. In so doing, we noted that elsewhere in the PSLRA Congress pointedly limited liability - to only .those misstatements that were made knowingly. Id. (citing 15 U.S.C. § 78u-5(c)(forward-looking statements) and id. § 78u-4(f)(joinNand-several liability)). With respect to one of these limitations, Congress was careful to state that “nothing in this subsection shall be construed to create, affect, or in any manner modify, the standard for liability associated with any action arising under the securities laws.” 15 U.S.C. § 78u-4(f)(l). And in Nathenson, we concluded that Congress’s specifying a heightened scienter requirement for those special provisions suggested that it meant to leave alone “the reckless state of mind[ ] uniformly held sufficient by the federal courts.” 267 F.3d at 409 (internal quotation's omitted). Thus, there is little room for doubt that in most circuits, and certainly in this one, an allegation of actual knowledge is not required to withstand a motion to dismiss.
Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000), cited by the majority here, was a case involving allegations of conscious, intentional fraud. There, defendants supposedly categorized certain out-of-date inventory as “Box and Hold,” meaning the company was able to" avoid having to write down its value. The inventory, fashionable ladies’ attire, depreciated with the times and. was likely to sell for only a small fraction of its originally-marked price. In the complaint, defendants were alleged to have led investors and analysts to believe that the company’s method of accounting accorded inventory its fair market value. The complaint also alleged that particular (but unnamed) company employees urged defendants to terminate the “Box and Hold” policy; that the defendants in express words refused to comply because of the effect discontinuance would have on the company’s stock price; and that defendants effectively maintained two sets of books, thereby hiding from public view the company’s inventory practices. The Second Circuit, in reversing dismissal by the district court, concluded, “There is no doubt that this pleading satisfies ... the requirement of the PSLRA that plaintiffs state facts with particularity that give rise to a strong inference of the required state of mind.” Id. at 312.
*437 I do not read the majority as citing Novak to suggest that it marks a floor for pleading scienter or even necessarily that it is representative of cases that have withstood a motion to dismiss since the PSLRA was enacted. Nevertheless, lest there be any confusion, our conclusion in this case does not rest on Plaintiffs’ having failed to set out “allegations of actual knowledge or intentional or deliberate behavior.” Maj. Op. at 433. Pleading severe recklessness does not require such contentions.
II.
I agree that the complaint in this case fails to give rise to a strong inference of scienter, although it is a close question. Taking Plaintiffs’ allegations as true, as we are required to do even under the PSLRA, see Nathenson, 267 F.3d at 406, the complaint lacks the requisite detail to support a strong inference. For example, Plaintiffs allege that Project Renaissance was initiated “after a decade of merger and acquisition activity[] left the Company’s accounting in disarray.” Compl. ¶ 41. But little or no facts are offered to support this bald contention. The complaint only specifically 'mentions one' company with which Baker Hughes merged, Western Atlas. Even as to that company, there is no detail about how its and Baker Hughes’s accounting practices differed. Companies are required to disclose[1] their methods qf accounting. Presumably, comparing Baker Hughes’s and Western Atlas’s respective reports and filings would have enabled Plaintiffs to explain how the respective accounting practices of each were incompatible, thus resulting in the claimed-of disarray. Plaintiffs could then have proceeded in this fashion with respect to each entity Baker Hughes had acquired over the years. As it stands, however, there is no basis for inferring that Project Renaissance was intended to remedy disparate accounting practices, let alone that such practices were generating faulty numbers. Without facts in this regard, we cannot infer that Defendants were severely reckless in claiming that Baker Hughes’s finan-cials were accurate as reported.
Clearly, the closest issue in the case is raised by Plaintiffs’ claim thiat Defendants’ statements to certain investment analysts that Baker Hughes had no “accounting issues” or “numbers issues” were fraudulent.[1] These statements were reported the day Baker Hughes’s chief• financial officer and- its comptroller, Eric Mattson and James Harris, both suddenly resigned. The complaint shows that analysts were concerned when Mattson and Harris unexpectedly left. Baker Hughes’s nebulous explanation for their leaving — that they wanted “to pursue other interests” — likely did little to mollify the situation. But Plaintiffs have failed explain how these events standing alone support a strong inference that the discovery of accounting irregularities precipitated Mattson’s and Harris’s leaving. Several months later, a report in Platt’s Oilgram News attributed the departures to cost overruns in the implementation of Project Renaissance. No facts have been alleged that would undermine this explanation. ■ Moreover, assuming for the moment that faulty accounting practices were the reason Matt-son and Harris left, Plaintiffs have failed to make particular allegations about how evidence of the problem had made its way *438 to Defendants. Plaintiffs argue that “Individual Defendants each received daily, weekly[,] and monthly financial reports to apprise them of the true financial status of Baker Hughes.” Compl. ¶ 95. No backup support is given for this contention, however. It would be easier to infer that they had received such reports if, for example, we were given information about who generated the reports, when they were reviewed, how Defendants responded to them, etc. See, e.g., In re Scholastic .Corp. Sec. Litig., 252 F.3d 63, 70-72 (2d Cir.2001). Not -having this information makes it difficult to say whether Defendants were reckless in misrepresenting Baker Hughes’s accounting controls.
As we concluded in Nathenson, allegations of motive and opportunity on the part of a defendant may in some cases contribute to a strong showing of scienter. 267 F.3d at 412. In reaching this conclusion, we suggested that the usefulness of such allegations depends on the facts of the case at hand. Id. at 411-12. Along these lines, we refused to adopt any hard-and-fast rule regarding the circumstances in which a strong inference of scienter can be drawn from the existence of motive and opportunity. In this case, I agree with my colleagues that Defendant Finley’s exercising 23% of the stock options he owned at the time does not in a material way contribute to reaching the strong-inference standard. In Florida State Board of Administration v. Green Tree Financial Corp., the Eighth Circuit determined that an “unusual or heightened motive will often form an important part of a complaint that- meets the Reform Act standard.” 270 F.3d at 660. Here, Finley’s trading activity was not “unusual or heightened.” But I believe that it is not necessary to flatly state, as the majority does, that “[o]nly insider trading in suspicious amounts or at suspicious times is probative of scienter.” Maj. Op. at 434. A case-specific evaluation of each complaint is better than absolute rules. I likewise think the majority goes too far in stating, “Further, even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period.” Id. at 434. Again, determining in advance which situations support an inference of scienter is getting away from the precepts of Nath-enson. Moreover, such an inference against one defendant ought not turn on a finding that his co-defendant likewise profited from illegal insider trading. See, e.g, Green Tree, 270 F.3d at 664-65.
Two other areas bear mention. In Nathenson, we concluded that the size and organization of the defendant company, together with the position of the individual defendant within it, supported an inference of scienter. There, we noted that the defendant was the chief executive of what “was essentially a one product company.” 267 F.3d at 424-25. Given that the company’s fortunes would rise, or fall based on the success of that single product, we deduced that that misstatements concerning it were more likely to have been made with scienter. In this case, Plaintiffs note that Baker Hughes’s INTEQ division, which was allegedly the source of the accounting irregularities in this case, accounted for 20% of the company’s revenues.. That is not an insignificant fraction. At the same feme, as the complaint notes, Baker Hughes has eight other divisions, with operations worldwide. Defendants’ understanding of the INTEQ situation therefore cannot be so easily inferred. Second, the size of the accounting restatement was relatively modest when compared to Baker Hughes’s revenues and profits generally. As such, inferring recklessness by Defendants is more difficult. Cf. Green Tree, 270 F.3d at 666 (“[T]he sheer size of the *439 $890 million write-down adds to the inference that the defendants must have been aware the problem was brewing.”)

. Not before us is the question whether statements to third-party analysts are actionable. See, e.g., Novak, 216 F.3d at 314-15. Also not before us is whether allegedly false statements reported by analysts but not attributed to a particular person are actionable. See, e.g., Florida St. Bd. of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 667-69 (8th Cir. 2001).