**In re APPLE COMPUTER, INC., SECURITIES LITIGATION**

This Document Relates To: All Actions

No. C–01–3667 CW.

United States District Court, N.D. California.

Dec. 11, 2002.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

WILKEN, District Judge.

In this class action, Plaintiffs allege that Defendants engaged in a fraudulent scheme to inflate the value of Apple Computer, Inc. (Apple) stock. In furtherance of this scheme, Defendants allegedly lied about the company's sales operations and new products. Defendants Apple Computer, Inc. and Steven P. Jobs have filed a motion to dismiss Plaintiffs' consolidated complaint (CC) pursuant to Rules 9(b) and 12(b)(6), Federal Rules of Civil Procedure. Plaintiffs oppose this motion. The matter was heard on September 13, 2002. Having considered the papers filed by the parties and oral argument on the motion, the Court GRANTS Defendants' motion.

### BACKGROUND [1]

Plaintiffs represent a class of all purchasers of Apple common stock between July 19, 2000 and September 28, 2000 (the class period). Defendants are Apple and Steven P. Jobs, Apple's chief executive officer (CEO) during the class period. Plaintiffs allege and Defendants have not disputed that Jobs controls Apple and is a controlling person under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). CC ¶¶ 1–2, 18.

Apple designs, manufactures and markets personal computers, primarily to education, creative, consumer and business customers. Plaintiffs allege that substantially all of Apple's sales are derived from its Apple Macintosh (Mac) line of computers. CC ¶ 17.

Plaintiffs allege that Apple was in the midst of a stock slump at the beginning of the class period. Early on July 19, 2000, Apple stock had fallen to $51–3/4, down from $75–3/16 in mid-March, 2000. Plaintiffs claim that, in order to escape this slump, Defendants made a series of false and misleading statements to prop up investor confidence, thereby defrauding Plaintiffs by artificially inflating the price of Apple stock. CC ¶¶ 23, 30, 194–6.

### I. Plaintiffs' Claims

Plaintiffs claim that Defendants committed securities fraud by (A) concealing the flaws and defects in its new G4 Cube computer through misrepresentations, (B) misrepresenting the capabilities of its new Power Mac G4 Dual Processor computer, (C) misrepresenting consumer demand for its iMac computers, (D) misrepresenting the progress of K–12 educational sales during the class period and (E) misrepresenting Apple's management of its component parts and finished goods inventories.

Plaintiffs allege that these misrepresentations were made to support Apple's 4Q 2000 forecast. According to the complaint, on July 18, 2000 Apple Chief Financial Officer Fred Anderson, Corporate Controller Peter Oppenheimer and Treasurer Gary Whistler "held a conference call and gave a glowing report about the Company's prospects" for 4Q 2000.[2] During this teleconference, Anderson stated that Apple was "targeting over 10% sequential growth." Anderson stated that he thought it would be "double digits." According to the complaint, based on the 3Q 2000 numbers Apple had just released, this equated

---

**1.** All facts are taken from Plaintiffs' complaint and all material allegations in the complaint are taken as true for purposes of this motion.

**2.** The relevance of the statements made during this teleconference is not clear because it occurred before the class period defined by Plaintiffs.

to revenue exceeding $2 billion for the 4Q 2000. Plaintiffs further allege that Apple CFO Anderson stated during this conference call that Apple forecast a $0.40+ earnings per share revenue increase. CC ¶ 24.

### A. G4 Cube

On July 18 and 19, 2000 Apple held its annual Mac World Conference in New York City. Jobs gave the keynote speech at this conference, in which he announced new Apple products, including the G4 Cube, the Power Mac G4 Dual Processor and several new iMac models. Plaintiffs allege that Jobs explained that these new products would drive Apple's revenues and earnings in the near-term and throughout fiscal years 2001–2002. CC ¶¶ 31–2.

The Power Mac G4 Cube (Cube) was a powerful desktop computer with a compact and dramatic design. As Jobs described it at Mac World: "The computer is in an 8–inch cube and it's suspended in a stunning crystal clear enclosure." Two versions of the Cube were to be made available in early August, 2000, at a cost of $1,799 and $2,299 without a monitor. CC ¶¶ 31–2.

The complaint alleges that the Cube Jobs unveiled during his Mac World speech and Cubes that were later loaned to analysts and members of the press were "hand-picked" Cubes that had no flaws. CC ¶ 33. The complaint further contains numerous excerpts from newspaper and magazine articles dating from July 20, 2000, which include quotes from Jobs describing the Cube as "the coolest computer ever." CC ¶ 35.

Plaintiffs claim that an analyst meeting was held sometime during the Mac World conference and that at this meeting Jobs, Anderson, and "other Apple Executives" spoke with members of the financial press and analysts from S.G. Cowen, Prudential Securities, Bear Stearns, DLJ Securities, A.G. Edwards, PaineWebber and Gerard Klauer Mattison. The complaint alleges that meeting attendees were told that Apple expected to sell 800,000 Cubes in its first year and 150,000 Cubes in 4Q 2000. CC ¶ 37.

The complaint excerpts a July 31, 2000 Newsweek article, published on or about July 24, 2000, in which Jobs is quoted:

[I]t's like a brain in a beaker. It's just hanging from this perfectly clear, pristine crystal enclosure. That's what's so drop dead about it. It's incredibly functional. The whole thing is perfect.... It's wonderful to make a pure expression of something and then make a million copies.... There will be a million copies of this out there.

CC ¶ 51.

Plaintiffs base their allegations on information from twenty-two confidential witnesses (CWs), most of whom are former Apple employees. According to information the complaint ascribes to CW1, a former Apple senior production supervisor, during the "final design and test manufacturing processes" for the Cube "Apple discovered" that "significant numbers" of Cubes coming off of its assembly lines had "mold lines, crazing or tiny cracks, which spoiled their appearance." According to CW2, the lead product designer for the Cube, the unique design of the Cube made these mold lines "impossible to eliminate" and Apple was never able "to reach true commercial production of perfectly clear pristine G4 Cubes during the class period." Based on information from CW9, a former Apple technical support representative, and CW11, a former Apple support service manager, Plaintiffs also allege that the Cube had a faulty on/off touch switch that tended to shift during shipment. The switch, located on the top of the Cube, was also highly sensitive to small movements and heat passing over it. These defects caused Cubes to power off spontaneously,

resulting in the loss of users' data. The complaint alleges that Jobs was aware of these problems when he gave his Mac World keynote speech "based on monthly Project Status Reports and the Project Risk and Opportunity Reports written by CW2." CC ¶¶ 52, 58–9, 72–4, 77, 34.

The complaint states that according to CW3, a former Apple design manager, the Cube's unique manufacturing problems resulted in a "reject rate" of over fifty percent. According to the complaint, CW1 recalled that at least seventy-five to eighty percent of the Cubes CW1 saw had some "cosmetic imperfection." According to CW5, a former Apple senior project design manager, "as late as late June/early July 2000" CW2 was having problems with the Cube manufacturing process. Plaintiffs allege that CW6, a former vice president of AppleCare Worldwide Service, confirmed that Apple used a "bug" tracking system, "Radar," that was used "to log, track and rank known problems." These problems were "reviewed during engineering meetings." According to CW6, Jobs was notified of "Class A bugs," bugs of "line-stopping urgency." The complaint states: "The cracks in the G4 Cube were listed as a Class A bug." CC ¶¶ 61, 63–4.

The complaint further states that according to CW7 and CW 12, former Apple university campus representatives, Apple held a "boot camp" in late June, 2000 for its campus sales representatives. According to CW12, Jobs spoke at the boot camp and addressed the Cube's "production and performance problems, but told the campus reps that the problems would be solved before release of the product." CC ¶ 65.

Plaintiffs cite statements from CW8, a former Apple global supply manager, describing how "soon after the Mac World New York presentation" the Cube manufacturing line was shut down for "1–2 weeks." According to CW8, "the manufac-turing obstacles were so great that mass producing G4 Cubes became virtually impossible and Apple debated whether or not to ship the Cube at all." The complaint states that according to CW1, in early August, 2000, Jon Rubinstein, Apple senior vice president of hardware engineering, sent a "call to arms" memorandum to production and engineering supervisors "to ramp up production of the Cube despite the defects." CC ¶¶ 69–70.

The complaint states that according to CW9, CW9 received twenty-five customer complaints per week "related to cosmetic imperfections in the G4 Cube" during an unspecified period of time. According to the complaint, CW9 kept a daily log of customer calls, which was submitted to the director of the Customer Support Center, Dave Thornton, at the end of each shift. The complaint states that according to CW9, "Apple took the unusual step of sending a memorandum" to its technical support representatives in August, 2000, "almost concurrent to the Cube's preliminary release," which told these representatives to " 'expect' a larger than usual number of calls from G4 Cubes owners" relating to problems with the Cube's appearance and power switch. According to CW10, a former customer service manager at Apple's Elk Grove, California plant and call center, complaints about "cracks and molding lines" in the Cube "were internally classified as a 'known issue,' " meaning that Apple had received enough complaints to be fully aware of the problem and "anyone who had reason to know, knew." CC ¶¶ 73–4.

Plaintiffs allege that customers who purchased defective Cube units were "incensed." Undated messages posted by customers on Apple's internet support site are excerpted in the complaint. CC ¶ 150.

Plaintiffs allege that senior officers of Apple, "including Apple's CFO, Treasurer,

Head of Operations and Head of Desktop Products" met with analysts at Prudential Securities on August 23, 2000. These officers told analysts that Apple was "operating according to plan" and "remained on track to deliver fourth quarter results." In addition, they stated that "[i]nitial orders for the Cube were strong." On September 13, 2000, Jobs was interviewed on financial news channel CNBC. When asked about current shortages of the Cube, Jobs stated that "many tens of thousands" of units had already been shipped. He further stated: "I think we're going to hit our forecasts this quarter, so if they're hard to find, I think that's because demand is greater than we thought it would be ..." According to the complaint, Jobs attended and gave the keynote speech at the Seybold computer conference on August 30, 2000. Plaintiffs allege that Jobs had "conversations with analysts at the conference," in which he stated that "Apple's target was 150,000 Cube units in the 4Q 2000 ..." According to Plaintiffs, on August 30, J.P. Morgan issued a report on Apple by Daniel Kunstler that was based on and repeated information provided by Jobs at the Seybold conference. CC ¶¶ 124, 134, 126–7.

The complaint includes an excerpt from an undated report by Lehman Brothers that appears to state that Apple sold 107,-000 Cubes by the end of 4Q 2000. CC ¶ 148.

### B. Power Mac G4 Dual Processor

Plaintiffs allege that Jobs also announced the new Power Mac G4 Dual Processor (Dual Processor) at the Mac World conference. According to the complaint, the Dual Processor was a desktop computer that contained two microprocessors, which purportedly would allow it to perform two tasks simultaneously. The complaint quotes Jobs Mac World presentation: "[B]ecause two brains are better

than one ... this is going to be the best Power Mac ever." CC ¶¶ 31–2, 83.

The complaint states that Jobs knew that the Dual Processor had "major operating defects that would ultimately drastically reduce demand and sales of the product in the 4Q 2000." First, according to the complaint, the operating system with which the Dual Processor came equipped, O/S 9, could not take advantage of dual processor technology. According to CW11, Apple's new operating system, O/S X, could make use of dual processor architecture, but was not to be released until 2001. According to Plaintiffs, Jobs used Adobe Photoshop, one of the only software programs that could make use of the dual processing function, in his Mac World presentation. In addition, the complaint states that the Dual Processor has a "slow clock rate of 500MHz." The complaint states that customers realized that without the dual processing function, the Dual Processor was nearly the same as the previous single processor version of the Power Mac G4. CC ¶¶ 84–6, 88.

Plaintiffs describe customer complaints about the Dual Processor received by various CWs. According to Plaintiffs, "Jobs and Apple" issued a memorandum about handling problems with the Dual Processor and Cube to frontline technicians in "early August 2000." CC ¶ 91.

### C. iMac Demand

The complaint states that Jobs announced four new models of its iMac computer at Mac World. However, according to Plaintiffs, these new models did not have rewritable CD drives and had 15-instead of 17-inch monitors. Plaintiffs allege that this reduced demand for the new models because consumers preferred larger monitors to view home movies and rewritable drives to create "customized music collections." Plaintiffs further allege that

Jobs knew of these shortcomings because Apple "do[es] a lot of market research," but "led the market to believe" that demand would be higher than it was. CC ¶¶ 93–4.

### D. K–12 Educational Sales

The complaint alleges that on April 15, 2000, Apple told its "K–12" educational sales agents that "they would be out of [their] jobs" after June 30, 2000. Apple was to switch to a new, internal sales force staffed by Apple employees, instead of independent contractors. According to Plaintiffs, many of these sales agents, who sold only Apple products, had longstanding relationships with their customers. According to Plaintiffs' CW19, a former Apple K–12 education account executive, nearly every school in the country receives its "budget money" for the next school year in July, which meant that agents were fired just before the educational buying season. The complaint describes agents signing contracts with Apple competitors or doing everything to close deals before the June 30 deadline, thus "cannibalizing" new sales and leaving nothing in the pipeline for 4Q 2000. CC ¶¶ 100–21.

Plaintiffs include an excerpt from a May 15, 2001 article in Fortune Magazine in which Jobs is quoted:

> "The problem was, we were very straightforward and told these third-party salespeople ahead of time that, 'Hey, in four months we're going to switch and you're going to be out of a job.' Obviously these folks did everything they could to sell as much as they could by June 30, when we let them go, and did absolutely nothing to build for sales in the July quarter. So when our new sales folks got there, they found there was no pipeline work at all; they had to start from scratch. And, duh, this was during the peak buying time for schools. It was just stupid on our part to do this then, and that was my deci-

sion. It was a train wreck, and it was totally my fault."

CC ¶ 154.

Plaintiffs also cite analyst reports, which appear to have been published after the class period. According to these reports, Apple experienced a sixty-million-dollar educational sales shortfall. These reports further state that forty percent of Apple's sales representatives were new to the company and fifty percent of Apple's education customers had new sales account managers. CC ¶ 148.

According to CW19, Apple gave each agent a sales quota and tracked revenue by school according to account numbers. Plaintiffs allege that commission reports were generated on a monthly basis, but interim reports could also be generated. The complaint states that according to CW20, a former sales manager for a third-party education agent, Apple used a comprehensive reporting/sales goal system known as the "Tool." CC ¶¶ 108–9.

Plaintiffs allege that on the July 18, 2000 conference call Apple Controller Peter Oppenheimer stated that "about a year ago we transitioned our agent sales force in high-ed ... and we started that last quarter in K–12 and that's progressed nicely for us." CC ¶ 27.

### E. Component Parts and Finished Goods Inventories

Plaintiffs allege that during 1996 to 1999, Apple pursued a restructuring plan to reduce its finished goods and component parts inventories. The complaint states that in early July, 2000, "Apple's channel inventories began to balloon due to the slower than expected retail sell-through of the new products as they were introduced." According to Plaintiffs, Apple would have to "take severe pricing action during the 4Q 2000" to remove this excess inventory. Plaintiffs further allege that

under Apple's component parts contracts, it agreed to substantial penalty terms. According to Plaintiffs, Apple began to cancel component parts orders "as early as August 2000" because of its excess finished goods inventory. Plaintiffs generally allege that "top executives" at Apple were aware of the company's inventory problems. CC ¶¶ 95–9.

The complaint alleges that at the August 23, 2000 meeting with "Prudential Securities analysts," "senior officers of Apple" stated: "Pricing actions had already been booked to clear inventory of older products and additional actions would not be necessary." An excerpt from an August 23, 2000 Prudential report that repeats this statement is included in the complaint. CC ¶¶ 124–5.

## II. Insider Stock Sales

The Complaint alleges stock sales by a number of Apple insiders. Plaintiffs claim that these sales demonstrate relevant scienter, but none of the insiders who allegedly sold stock during the class period were described as having made any false or misleading statements. Plaintiffs rely on a Black–Scholes analysis to explain the selling patterns of insiders, including that of Jobs who sold no stock during the class period. CC ¶¶ 156–85.

## DISCUSSION

### I. Legal Standards

#### A. Rule 12(b)(6)

Dismissal of a complaint for failure to state a claim can be based on either the lack of a cognizable legal theory or the lack of sufficient facts alleged under a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988).

Although generally a court may not consider material beyond the pleadings in ruling on a Rule 12(b)(6) motion, material which has been properly submitted as part of the complaint may be considered. *See Cooper v. Pickett,* 137 F.3d 616, 623 (9th Cir.1997); *see also Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir. 1987). Moreover, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994). A court may also consider documents which are not expressly incorporated into the complaint, but "upon which the plaintiff's complaint necessarily relies." *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir.1998).

When granting a motion to dismiss, a court is generally required to grant a plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. *See Cook, Perkiss & Liehe, Inc. v. Northern Cal. Coll. Serv. Inc.,* 911 F.2d 242, 246–47 (9th Cir.1990). In determining whether amendment would be futile, a court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." *Reddy v. Litton Indus., Inc.,* 912 F.2d 291, 296 (9th Cir.1990). Leave to amend should be liberally granted, but an amended complaint cannot allege facts inconsistent with the challenged pleading. *See id.* at 296–97.

### B. Pleading Requirements

■ In 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub.L. No. 104–67, which amends the Securities Exchange Act of 1934. Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder make it unlawful for

any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b–5 (Rule 10b–5). To state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege: "(1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages." *Paracor Fin. Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996); *see also McCormick v. Fund Am. Cos.*, 26 F.3d 869, 875 (9th Cir.1994).

■ Plaintiffs must plead securities fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1543 (9th Cir.1994) (en banc) (*GlenFed I*). Further, although Rule 9(b) does not require that scienter be plead with particularity, *see Concha v. London*, 62 F.3d 1493, 1503 (9th Cir.1995), the PSLRA does. *See* 15 U.S.C. § 78u–4(b)(2).

### 1. Circumstances Constituting Fraud

■ Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985). The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

Except with respect to allegations made on information and belief, the PSLRA pleading standard for allegations about the circumstances constituting fraud is the same as the Ninth Circuit's pre-PSLRA standard under Rule 9(b). Before the enactment of the PSLRA, plaintiffs already were required to plead specifically the time, place and nature of the alleged misrepresentations, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987), and to explain why each alleged misstatement or omission was false or misleading when made, *see GlenFed I*, 42 F.3d at 1549.

The PSLRA's requirement regarding allegations plead on information and belief is somewhat stricter than the Ninth Circuit's pre-PSLRA standard. For allegations made on information and belief, pre-PSLRA case law in the Ninth Circuit required "a statement of the facts upon which the belief is founded," *see Wool*, 818 F.2d at 1439, but did not expressly require that plaintiffs specifically plead *all* facts upon which the belief was based. The PSLRA, however, requires exactly that. *See* 15 U.S.C. § 78u–4(b)(1).

### 2. Scienter

The PSLRA provides that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Because the instant action alleges violations of § 10(b), the "required state of mind" is defined by § 10(b). *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir.1999).

■ Ninth Circuit case law prior to *Silicon Graphics* made clear that some forms of recklessness are sufficient to satisfy the

element of scienter in a § 10(b) action. *See Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir.1978). Within the context of § 10(b) claims, the Ninth Circuit defines "recklessness" as

a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). As explained by the *Silicon Graphics* court, recklessness, as defined by *Hollinger*, is a form of intentional conduct, not merely an extreme form of negligence. *See* 183 F.3d at 976–77. Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[ ] some degree of intentional or conscious misconduct." *See id.* at 977. The *Silicon Graphics* court refers to this subspecies of recklessness as "deliberate recklessness." *See id.* at 977.[3]

■ The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness. *See* 15 U.S.C. § 78u–4(b)(2); *Silicon Graphics*, 183 F.3d at 977. Facts that establish a motive and

opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. *See* 183 F.3d at 979. In order to satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.*

■ It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement. *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435–6 (9th Cir.1995). The Ninth Circuit has rejected the concept of "collective scienter" in attributing scienter to a corporation. *See id.*

■ Finally, the general rule is that all material allegations in a complaint will be taken as true and construed in the light most favorable to the plaintiff in deciding a Rule 12(b)(6) motion. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). However, under the Ninth Circuit's recent decision in *Gompper v. VISX*, 298 F.3d 893, 896–7 (9th Cir.2002), plaintiffs in PSLRA cases are not entitled to have only

---

**3.** At least one district court in this circuit has concluded that the "deliberate recklessness" standard is a more stringent standard than the one set forth in *Hollinger*. *See In re Southern Pacific Funding Corp. Sec. Litig.*, 83 F.Supp.2d 1172, 1177 (D.Or.1999). Although it recognized that "[t]here is language in [*Silicon Graphics*] that suggests that it is merely restating the standard set forth in *Hollinger*," the *Southern Pacific* court concluded that *Silicon Graphics* "raised the substantive standard applicable to § 10(b) claims." *See id.*

Read in that manner, *Silicon Graphics* overturns *Hollinger*. Because *Hollinger* was an en banc decision, while *Silicon Graphics* not, this reading cannot be correct. *See United States v. Aguilar*, 883 F.2d 662, 690 n. 25 (9th Cir.1989) ("a panel not sitting en banc has authority to overturn Ninth Circuit precedent"). This Court there concludes that the "deliberate recklessness" standard in *Silicon Graphics* is the same as the standard discussed in *Hollinger*.

favorable inferences drawn on their complaints. In PSLRA cases, negative competing inferences must also be considered in deciding Rule 12(b)(6) motions. *See id.*

### II. Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint[4]

■ In their motion to dismiss Plaintiffs' complaint, Defendants make both specific and general arguments regarding the insufficiency of Plaintiffs' claims.

### A. "Bespeaks Caution" Doctrine and 15 U.S.C. § 78u–5(c) Safe Harbor

■ Defendants argue that the statements by Jobs and other Apple officers are subject to the safe harbor provisions of 15 U.S.C. § 78u–5(c)(1) and the "bespeaks caution" doctrine. In order for the safe harbor to apply, a forward-looking statement must both be "identified as a forward-looking statement, and [be] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i).[5] The bespeaks caution doctrine, which was

formulated by courts prior to the enactment of the PSLRA, operates in a very similar fashion.[6] This doctrine

> provides a mechanism by which a court can rule as a matter of law … that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.

*Provenz v. Miller,* 102 F.3d 1478, 1493 (9th Cir.1996) (citing *In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1413–4 (9th Cir.1994)). Both the safe harbor and the bespeaks caution doctrine shield a defendant from liability for statements that both (1) are forward-looking and (2) include sufficient cautionary language. The Ninth Circuit has explained that the bespeaks caution doctrine merely stands for "the unremarkable proposition that statements must be analyzed in context." *Id.*

■ The cautionary statements upon which Defendants attempt to rely were made in Apple's 1999 Form 10–K, its 3Q00 Form 10–Q and the July 18, 2000 teleconference. Any cautionary state-

---

4. In support of their motion, Defendants have filed a declaration (Docket No. 34). In their opposition, Plaintiffs argue that exhibits 11, 12 and 13 of this declaration are extrinsic evidence "not mentioned in the Complaint or supported by the facts." These exhibits purport to be summaries of the stock prices of Apple and other companies during the class period, stock repurchases by Apple during the class period and disclosures made by Apple in SEC filings. The Court is "generally confined to consideration of the allegations in the pleadings" in deciding a Rule 12(b)(6) motion. *Embury v. King,* 191 F.Supp.2d 1071 (N.D.Cal.2001). One exception to this rule is the "incorporation by reference doctrine," which "permits a district court to consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Silicon Graphics,* 183 F.3d at 986 (quotations omitted). However, in this case, Plaintiffs have no

allegations regarding the SEC filings summarized by Defendants. Further, as set forth in *Silicon Graphics,* the incorporation by reference doctrine applies to "documents," not summaries of documents. For these reasons and because Defendants do not respond to Plaintiffs' objection in their reply brief, Plaintiffs' objection is sustained.

5. The forward-looking statement must also be shown by the plaintiff to be material and knowingly false. *See* 15 U.S.C. § 78u–5(c)(1)(A)(ii),(B).

6. The Sixth and Eleventh Circuits have described 15 U.S.C. § 78u–5(c) as a codification of the bespeaks caution doctrine. *See Helwig v. Vencor, Inc.,* 251 F.3d 540, 547–8 (6th Cir.2001); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276, n. 7 (11th Cir.1999). The Ninth Circuit has not specifically addressed the relationship between the bespeaks caution doctrine and § 78u–5(c).

ments made in the 10–K and 10–Q forms are irrelevant here. Plaintiffs' fraud claims are not based on any statements included in these forms. If Defendants mean to argue that cautionary statements in these forms may trigger application of the safe harbor or bespeaks caution doctrine with respect to statements not made in these forms, this position is without merit. The making of a cautionary statement on one occasion does not provide a shield to liability for all statements subsequently made. In order for the safe harbor or bespeaks caution doctrine to apply, a cautionary statement must "accompan[y]" or be "contained" in the statement that is the basis for a plaintiff's claim.

■■■ This leaves the cautionary statement made during the July 18 teleconference. Defendants point to a statement made by Apple Director of Investor Relations Nancy Paxton at the beginning of this teleconference:

> And before we review the financial results, please note that some of the information you'll hear during this call consists of forward-looking statements and that actual trends could differ materially from our forecast. For more information, please refer to Apple's SEC filings.

The question here is whether Paxton's statement immunizes Defendants from liability for other statements made during this conference call on which Plaintiffs' claims do appear to be based. It does not. The Ninth Circuit has held that, for purposes of the bespeaks caution doctrine,

> cautionary statements must be precise and directly address[ ] ... the [defendants'] future projections... Blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim.

*Provenz,* 102 F.3d at 1493 (internal quotations omitted). Paxton's statement that "actual trends could differ materially from our forecast" was nothing more than the kind of "blanket warning" discussed in *Provenz.* As such, it is insufficient for purposes of the bespeaks caution doctrine.

The Ninth Circuit has not decided what constitutes a "meaningful cautionary statement" for the purposes of § 78u–5(c)(1). However, it is clear from the text of the statute that Paxton's statement was not adequate. According to § 78u–5(c)(1)(A)(i), a "meaningful cautionary statement" must "identif[y] important factors that could cause actual results to differ materially from those in the forward-looking statement." Paxton's statement identifies no such factors. Thus, this statement is also insufficient to support application of the § 78u–5(c)(1) safe harbor.

**B. Strength of Inference of Knowing Misrepresentation**

Defendants make specific attacks on the sufficiency of Plaintiffs' pleading of their claims relating to the Cube, the Dual Processor, the new iMac models, and K–12 sales. Defendants also attack Plaintiffs' allegations as to insider stock sales.

**1. The Cube**

Defendants first argue that most of the many statements about the Cube Plaintiffs cite in their complaint are generic expressions of optimism insufficient to support a securities fraud claim. Defendants are correct.

■■■ General statements of optimism and "puffing" about a company or product are not actionable. *See In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1236 (N.D.Cal.1994). "No matter how untrue a statement may be, it is not actionable if it is not the type of statement that would significantly alter the total mix of information available to investors." *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1245 (N.D.Cal.1998) (quotation marks and

citation omitted). "Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the Company." *In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1481 (N.D.Cal.1992), *aff'd*, 11 F.3d 865 (9th Cir.1993).

■■■ Focusing on Plaintiffs' central theory—that Apple knew, when announcing its July forecast, that fewer Cubes than projected would be sold—Defendants argue that the manufacturing problems with the new product were minor and not unusual to the industry. This is not so. According to Plaintiffs' allegations, based on Defendants' own statements, the Cube's appearance was an integral part of the product. Similarly, the power switch problems, though seemingly simple, impaired the basic functionality of the machine.

The principal issues here are Plaintiffs' allegations as to the prevalence of these defects and Defendants' knowledge and awareness of the defects. Defendants argue that Plaintiffs' allegations as to the extent of Cube defects amount to general statements that "many" Cubes were defective or anecdotes from various CWs about problems they observed or that were reported to them. In fact, Plaintiffs' allegations go further than this. Plaintiffs also make allegations about memoranda from Apple management to technical support staff regarding Cube problems. With these allegations taken together, Plaintiffs have plead the existence of extensive problems with the Cube.

■■■ The question is whether Plaintiffs have plead Defendants' knowledge of these defects sufficiently to prove fraud. Defendants argue that Plaintiffs' reliance on internal reports, data tracking systems and media accounts of Jobs' management style are not adequate to show that Jobs actually knew of the unresolved Cube problems when he made his Mac World speech and later statements about the progress of Cube sales.[7] Mere access to data is insufficient to support a securities claim under the PSLRA. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035–6 (9th Cir.2002); *Kane v. Madge Networks*, 2000 WL 33208116, *10 (N.D.Cal.2000). Similarly, general allegations about a "hands-on" management style are insufficient. *See In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1088 (9th Cir.2002); *Madge Networks*, 2000 WL 33208116, at *10.

Plaintiffs argue that their allegations regarding Jobs' management style go beyond it being "hands-on." The article cited in the complaint does describe Jobs' management practices in somewhat more detail, stating that he "runs every aspect of the company" and that Apple's management structure is "tight-knit." This is still not sufficient. It is not enough for Plaintiffs to allege that Defendants could have known about the Cube problems, or even that they should have known about them. Plaintiffs must allege something approaching actual knowledge on the part of Jobs or other Apple officers who made statements regarding the company. Because they do not, their claim regarding alleged misrepresentations about the Cube fails.

7. Plaintiffs' allegations regarding Jobs' acknowledgment of Cube's manufacturing and performance problems at the technical service "boot camp" are not sufficient. According to the complaint, Jobs also said that he expected these problems to be solved in time for final release. Plaintiffs have not alleged that Jobs knew this was impossible, either at the time of the boot camp or the Mac World conference. "Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir.2001).

■ Defendants also argue that Plaintiffs do not plead sufficient detail about their CWs to establish the reliability of these witnesses.[8] As this Court has explained, under *Silicon Graphics*, 183 F.3d at 985, where a plaintiff alleges a misrepresentation on information and belief, the plaintiff is required to plead all *relevant* facts regarding the basis for its belief. *See In re Secure Computing Corp. Sec. Litig.*, 184 F.Supp.2d 980, 987 (N.D.Cal. 2001). The precise amount of detail will depend on the circumstances. Unless other details about the identity of the CW are necessary to establish the CW's reliability, a job title will usually be an adequate description of a CW. Defendants do not show why more specific descriptions of the CWs are necessary in this case.

However, a job title by itself will seldom provide an adequate description of the CW's basis for his or her knowledge. For this reason, CW6's allegations that "Jobs was notified" of cracks in the Cube casings is insufficient. Defendants correctly point out that Plaintiffs do not describe when or how Jobs was notified or how CW6 would know this information. It is not enough for Plaintiffs to allege that a CW6 is former vice president of AppleCare Worldwide Service.

### 2. The Dual Processor and New iMac Models

■ Defendants attack Plaintiffs' allegations regarding the Dual Processor and new iMac models as fatally vague. Defendants argue that Plaintiffs do not allege how many customers were affected by the Dual Processor's shortcomings, namely, the inability of O/S 9 to make use of the second processor for most applications and the slow clock rate, or how this information came to be known by Jobs or other Apple officers. As to the former, allegations about the exact number of customers affected might not be necessary in light of Plaintiffs' allegations regarding Apple's technical memo on Dual Processor defects. However, as with the Cube, Plaintiffs do not allege that Jobs was deliberately reckless as to these defects and the effect they would have on Dual Processor sales when he made his Mac World speech, nor do they allege deliberate recklessness on the part of any other Apple officer.

Similarly, Defendants argue that the iMac allegations do not adequately explain the basis for Plaintiffs' belief that, at the time of the Mac World conference, Jobs or other Apple officers knew that consumers would demand 17–inch monitors and rewritable CD drives. Instead, Plaintiffs rely on Jobs' statement that Apple does "a lot of market research." This is not sufficient. For their fraud claim against Jobs for these statements to survive Defendants' motion, Plaintiffs must allege something approaching actual knowledge on Jobs' part as to these problems and the effect they would have on iMac sales.

### 3. K–12 Sales

■ As with Plaintiffs' other claims, Defendants attack the K–12 sales claim as vaguely alleged. Again, the issue is one of Defendants' knowledge. The specific statement that Plaintiffs emphasize is Oppenheimer's comment during the July 18, 2000 conference call that the sales transition had "progressed nicely." Plaintiffs correctly point out that this comment, brief as it is, is more than non-actionable "puffing." *See Gupta*, 900 F.Supp. at 1236. This was a statement about Apple's present business conditions, its posture in a key market. However, Plaintiffs do not

---

**8.** Defendants reiterate this argument in a more general fashion in a separate section of their motion.

allege that Oppenheimer knew this statement to be false when he made it. Instead, they make allegations about the "Tool" tracking system to show how he could have known. Mere access to contradictory information is not sufficient to show deliberate recklessness. *See Lipton,* 284 F.3d at 1035–6.

#### 4. Insider Stock Sales and Scienter

 Plaintiffs provide a lengthy account of insider stock sales during the class period and analyze the patterns they find according to the Black–Scholes model. Defendants argue that this does not establish scienter to support a securities fraud claim. Defendants are correct. First, while the Ninth Circuit has held that sufficiently "'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter," *see Silicon Graphics,* 183 F.3d at 986, none of the insiders who sold stock during the class period were alleged to have made any false or misleading statements. Because the Ninth Circuit has rejected the concept of "collective scienter" for the purposes of establishing fraud, *Chubb,* 54 F.3d at 1435–6, circumstantial evidence as to one officer's state of mind is irrelevant to what another officer says. Evidence of the scienter of the officer making the statement is all that is relevant. Here, because none of the inside sellers were alleged to have made any statements, their stock sales cannot be used to establish fraud.

Second, this Court is not aware of any other court that has used the Black–Scholes model to establish scienter in a securities fraud case. Even if the sales Plaintiffs analyze were relevant, the Court would not find that the model could be used to establish scienter in this situation.

#### C. Third Party Statements

 In addition to their attacks on Plaintiffs' specific claims, Defendants, relying on *In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 934 (9th Cir.1996), briefly put forth a more general argument that they cannot be held liable in this case for statements made by third parties because Apple did not place its imprimatur on them. However, as Plaintiffs respond, a defendant may also be liable under a conduit theory. "A defendant can be held liable for false or misleading statements made by a third party analyst if the defendant . . . provides the analyst with false or misleading information with the intent that the analyst will communicate that information to the market." *Secure,* 184 F.Supp.2d at 990.

 Here, the fact that Defendants hosted media events, such as Mac World, held meetings and conference calls with analysts and participated in interviews is sufficient to show that Defendants intended that their statements be communicated to the market. Plaintiffs have also made detailed allegations about statements the analysts actually made to the market as a result of information provided at Defendants' media events, meetings, and conference calls. However, to survive a motion to dismiss, Plaintiffs' claims must still sufficiently allege that the information provided was *knowingly* false or misleading. Because they have failed to do so, their claims fail, even though the third party statements may otherwise be properly relied upon in the complaint.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for failure to state a claim is GRANTED. Plaintiffs' consolidated complaint is dismissed with leave to amend.

Any amended complaint shall be filed within thirty days from the date of this order. Defendants' motion to dismiss shall be filed within thirty days from the date of

the filing of the amended complaint. The hearing on the motion to dismiss shall be noticed for a date thirty-five days from its filing.

IT IS SO ORDERED.